IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LORI NIEMUTH,

                          Plaintiff,

        v.                                                    OPINION and ORDER

THE EPIC LIFE                                                 20-cv-629-jdp
INSURANCE COMPANY,

                          Defendant.

---

Plaintiff Lori Niemuth worked as an Executive Assistant and Office Manager at Oakbrook Corporation. Niemuth suffers from fibromyalgia, which led her to stop working and apply for long-term benefits through her employer's disability insurance plan, which was administered by defendant The EPIC Life Insurance Company. EPIC initially approved Niemuth's claim. But EPIC continued to review her status, and later terminated her long-term disability benefits. Niemuth appealed; EPIC affirmed its termination decision. Niemuth now brings this action under the Employee Retirement Income Security Act of 1974 (ERISA), challenging EPIC's decision to terminate her long-term disability benefits. Both sides move for summary judgment. Dkt. 20 and Dkt. 23.

The central issue is whether Niemuth has adequately documented her continued disability with objective evidence, as required by her policy. Niemuth is correct that fibromyalgia itself cannot be diagnosed by purely objective means, such as an MRI or blood test. But EPIC asked Niemuth to provide corroborating evidence of the physical limitations caused by her fibromyalgia, and she failed to do so. The court concludes that the claims administrator fully and fairly reviewed all of the evidence related to Niemuth's claim and came

to the rational conclusion that her condition was not disabling. The court will grant EPIC's motion, deny Niemuth's, and enter judgment for defendant.

FACTS OF RECORD

Neither side seeks to introduce evidence outside the record of EPIC's claims review process, so the court will confine its review to that record, which establishes the following.

**A. Niemuth's work and diagnosis**

Plaintiff Lori Niemuth worked as an Executive Assistant/Office Manager at Oakbrook Corporation since 2002. Her duties included typing, filing, scheduling, coordinating meetings, purchasing office equipment, preparing selected marketing materials, and working on special projects. The job required sitting continuously or alternating with standing, standing two hours a day, walking three hours a day, and lifting no more than 10 pounds.

Niemuth was diagnosed with fibromyalgia in 2014 by Dr. Dirk Nuenninghoff, a rheumatologist. In addition to experiencing the widespread myofascial pain that is characteristic of the condition, Niemuth experiences nausea, gastrointestinal issues, insomnia, headaches and fatigue. She began missing work because of her condition in 2015, and she used both paid time off and unpaid leave under the Family and Medical Leave Act of 1993 to cover her medical-related absences. Niemuth has taken several medications and tried other treatments to mitigate her pain, including chiropractic care, acupuncture, pain management classes, mindfulness classes, and counseling.

**B.  The policy**

Niemuth obtained a disability insurance policy that Oakbrook offered to its employees under a group insurance policy issued by defendant The EPIC Life Insurance Company. The policy is governed by the provisions of ERISA, 29 U.S.C. § 1001 et seq.

Under EPIC's policy, "Disability or Disabled" means:

1. During the elimination period, you are prevented from performing one or more of the essential duties of your occupation;

2. For 36 months following the elimination period, you are prevented from performing one or more of the essential duties of your occupation, and as a result, your current monthly earnings are less than 80% of your indexed pre-disability earnings;

3. After that, you are prevented from performing one or more of the essential duties of any occupation.

Dtk. 18-1 at NIEMUTH PLAN 0024. Disability must be the result of accidental bodily injury, sickness, mental illness, substance abuse or pregnancy. *Id*.

"Your occupation" is defined in the policy as "your job as it is recognized in the national economy . . .". *Id*. at 009. "Essential duty" means

A duty that you're required to perform as part of your job with your employer for compensation and that: (1) is substantial, not incidental; (2) is fundamental or inherent to the occupation; and (3) can not be reasonably omitted or changed. To be at work for the number of hours in your regularly scheduled workweek for your employer is also an essential duty.

*Id*. at 0007.

The policy requires proof of loss and specifies that all proof submitted must be satisfactory to EPIC within 90 days after the start of the period for which EPIC owes payment. EPIC may request proof of loss throughout the disability and reserves the right to determine

whether the proof of loss is satisfactory. *Id*. at 0021. The policy also gives EPIC the right to require the insured to be examined by a doctor, vocational expert, functional expert, or other medical or vocational professional of EPIC's choice. *Id*. at 00154.

EPIC requires recipients of LTD payments to apply for Social Security disability benefits and pursue that claim through the administrative hearing phase. *Id*. at 0155. If the insured succeeds in obtaining social security disability, then EPIC deducts the amount of those payments from the LTD payment amount. *Id*. at 00142.

Finally, the policy has a "Termination of Benefits" provision, which states that EPIC will terminate benefit payment on the first of various events to occur. *Id*. at 0013. Events that trigger termination include: (1) the date the insured is "no longer disabled as defined in the policy"; (2) the date the insured fails to furnish proof of loss when requested by EPIC; and (3) the date the insured "fail[s] to provide satisfactory, objective medical proof of continued disability." *Id*.

## C. Niemuth's initial application

At a visit with Dr. Nuenninghoff on March 1, 2018, Niemuth reported that she had not been doing well and had poor work attendance due to severe nausea and widespread body pain. R. 1255. Examining Niemuth that day, Dr. Nuenninghoff detected "tenderness of all of the multiple fibromyalgia tender points," but he noted no other physical abnormalities. R. 1256. Dr. Nuenninghoff concluded:

> Unfortunately, she has not been making significant progress both with fibromyalgia and intermittent debilitating nausea type symptoms. I have discussed with her that we typically do not support patients going on disability for fibromyalgia alone. However, she has tried various treatment avenues and has not been making significant progress. I would support her going on short-term disability for now. I have discussed with her the subjective nature of disability questionnaires.

4

Dkt. 18, exhs. 2–6, NIEMUTH CLAIM FILE, R. 1256.

Niemuth stopped working on March 30, 2018. With the support of Dr. Nuenninghoff, she applied for long-term disability (LTD) benefits on May 22, 2018. R. 177. Dr. Nuenninghoff completed an Attending Physician Statement (APS) on which he indicated that Niemuth's functional capacity was severely limited and she was incapable of even minimum (sedentary) activity. R. 3079, 3096. The doctor described Niemuth's physical limitations as: "pain – difficult to sit, kneel + get back up, pain while working on computer/sitting@desk – any physical activity/movement makes nausea extreme, headaches every day." R. 3079.

Niemuth saw Dr. Nuenninghoff on June 1, 2018. She reported that she continued to have widespread body pain that prevented her from doing even a sedentary job or regular aerobic exercise. R. 3049. She continued to take duloxetine. During his physical examination, Dr. Nuenninghoff found that Niemuth had "tenderness of all of the multiple fibromyalgia tender points" but no lower extremity edema, no synovitis in her joints, and had normal strength in all extremities. He diagnosed fibromyalgia, nausea, and irritable bowel syndrome with diarrhea. Dr. Nuenninghoff wrote that Niemuth had not been making progress in controlling her fibromyalgia symptoms, he had nothing new to offer her, and she appeared incapable of even sedentary work. R. 3050.

Around that same time, Niemuth attended a follow-up appointment with her integrative medicine physician[1], Dr. Dorothy Jill Mallory. Niemuth told Dr. Mallory that any

---

[1] Integrative medicine uses non-conventional treatments such as acupuncture, meditation, aromatherapy, dietary and herbal supplements as complements to standard medical treatment to help people deal with conditions such as cancer, headaches and fibromyalgia. https://www.mayoclinic.org/tests-procedures/complementary-alternative-medicine/about/pac-20393581 (visited Nov. 21, 2022).

little housework caused pain flares, activity and exercise consistently hurt, and she often needed a day to recover if she was active. R. 2930. Niemuth also reported digestion issues and difficulty sleeping, stating she was "not sleeping for days at a time." R. 2930.

Around July 30, 2018, EPIC's clinical management team reviewed Niemuth's LTD claim and found that:

> [Restrictions/limitations] supported at this time from [disability onset date] to present and ongoing. [Employee] with fibro, objectified by 18/18 trigger points, sig fatigue, as well as frequent [headaches], nausea, chronic IBS with diarrhea. She has tried multiple treatment modalities including meds, supplements, chiro, acupuncture, massage, with no improvement to [symptoms]. [Attending physicians] continue to make treatment changes in order to better control [symptoms]. Prognosis guarded.

R. 75-76. EPIC approved Niemuth's claim for LTD benefits on August 1, 2018. R. 167.

## D. EPIC's continuing review

Although EPIC approved Niemuth's claim, the reviewer also recommended that EPIC keep a "close watch" on her claim to see if her symptoms improved. R. 75-76.

During a November 7, 2018 interview, Niemuth told an EPIC claims examiner that she was still unable to return to work because she had pain throughout her body, constant nausea, constant fatigue, irritable bowel symptoms 90 percent of the week, and a migraine 75 percent of the week. R. 67. She said that on a typical day, she got up and sat for a few hours because it was hard to move right away. She made the bed, showered, made meals for herself, did laundry, and tried to walk around the house for exercise. In the afternoon, she read or watched TV. She attended her doctor's appointments and might drive to the bank and post office, but her husband did the errands. She said she could stand or walk for a maximum of 15 minutes. Sitting could range from 15 minutes to an hour but she could drive for an hour and a half. She could lift a maximum of 40 pounds and could bend over. R. 68.

6

About February 6, 2019, EPIC received updated records from Dr. Nuenninghoff, including records from a December 7, 2018 office visit with Niemuth. The doctor's office visit notes stated that Niemuth was not doing any better and was unable to return to work because of chronic, persistent nausea with severe flares, widespread pain, and insomnia. Niemuth was continuing to take 60mg of duloxetine daily. The only physical abnormalities noted by Dr. Nuenninghoff was tenderness of "multiple fibromyalgia tender points." The doctor again noted that he had nothing else to offer her from a treatment standpoint. R. 1229–30.

EPIC also received an "Attending Physician Statement – Progress Report" from Dr. Nuenninghoff, dated January 17, 2019. Dr. Nuenninghoff indicated that in an 8-hour period, Niemuth could sit for 1 hour at a time for a total of 6 hours; stand for less than 1 hour at a time for a total of 2 hours; and walk for less than 1 hour at a time for a total of 1 hour. Although the form asked for medical findings or rationale if the doctor opined the patient was unable to continuously sit, stand or walk, Dr. Nuenninghoff did not provide any. Dr. Nuenninghoff further indicated that Niemuth could only occasionally bend, kneel, climb, balance or drive, and could occasionally use her upper extremities to perform fine manipulation, gross manipulation, reaching above the shoulder, and reaching below the shoulder or at desk or workbench level. R. 210. He further found she could lift 20 pounds occasionally for up to 2.5 hours, noting that lifting weights brings on the "flu/sick feeling/dizziness." *Id*. According to his report, he had last seen Niemuth on December 7, 2018, and her status was "unchanged." *Id*.

On March 4, 2019, EPIC's claims examiner told Niemuth that Dr. Nuenninghoff's latest APS indicated that she could perform sedentary work, and the examiner questioned whether there "may be a disconnect" between the doctor's December 7 medical note and what he wrote in the APS. R. 58. Niemuth responded that she would talk to Dr. Nuenninghoff about

revising his statement. R. 59. On March 6, Niemuth called EPIC and said that the doctor's APS was wrong and asked "what if we just change it to 0 hours?" EPIC advised her that Dr. Nuenninghoff would have to support any such statement with medical evidence. R. 59. Niemuth also advised that she would be seeing a new rheumatologist, Dr. Sara McCoy, on May 28, 2019. R. 58.

On March 6, 2019, Dr. Nuenninghoff resubmitted to EPIC the January 17, 2019 APS, but with alterations. Specifically, Dr. Nuenninghoff changed his opinion to state that Niemuth could sit for one hour at time for a total of only hour; stand intermittently for less than one hour at a time, for a total of one hour; and occasionally lift five pounds. R. 207. Thus, Dr. Nuenninghoff essentially found that plaintiff would need to lie down for five of eight hours a day. Dr. Nuenninghoff represented that the altered form was a "clarification" of the first, but he did not offer any explanation for his change in opinion. *Id*.

EPIC's claim file reflects that it had concerns about Dr. Nuenninghoff altering his form after Niemuth contacted him, but it decided to wait to reevaluate Niemuth's LTD claim until after she saw Dr. McCoy. R. 57. Niemuth saw Dr. McCoy on May 28, 2019. R. 1182–88. Reviewing Niemuth's subjective complaints, Dr. McCoy noted that Niemuth reported a 20-year history of pain involving her neck, shoulders, back, knees and hips, that had increased in severity and frequency over the years, interrupted her sleep, and that was better with rest. McCoy recorded that Niemuth also complained of chronic headaches and frequent nausea, particularly with physical activity. On physical examination, Dr. McCoy noted that Niemuth's joints of the hands and wrists appeared to move normally with no indication of synovitis; her elbows were normal without nodules; her shoulders had full range of motion; there were no clear abnormalities of the hips, knees, ankles, or feet; and her cognitive function was intact.

8

R. 1186. The doctor did note some mild swelling and tenderness in one of her salivary glands, as well as "tenderness along the entire examination of the upper arms, chest, back and legs in a distribution consistent with known fibromyalgia." *Id.* Dr. McCoy remarked that Niemuth's "decades-long history of diffuse pain in the setting of normal inflammatory markers" was most consistent with fibromyalgia, which could be treated by her primary care provider, physician's assistant Karen Wendler. She attached a list of medications used to treat fibromyalgia for Wendler's reference and encouraged Niemuth to get regular exercise, suggesting that she try Tai Chi. The Dr. McCoy declined to provide an APS supporting disability. R. 53, 252.

On June 19, 2019, a medical case manager for EPIC performed a clinical assessment of Niemuth's medical records, including the latest records from Dr. McCoy. She found the evidence insufficient to support restrictions or limitations that would prevent Niemuth from returning to work. R. 48–49. On that same date, the case manager wrote to Dr. Nuenninghoff, asking him to explain the discrepancy between his January 17, 2019 Attending Physician Statement and the addendum submitted on March 6, 2019. EPIC also asked the doctor to state his "medical rationale" and identify the objective medical evidence that supported his opinion of Niemuth's restrictions. R. 1176. Responding to EPIC's inquiry, Dr. Nuenninghoff wrote that there had been "no change" in Niemuth's function that accounted for his March 6 modification. In response to EPIC's request for objective evidence, the doctor wrote: "Limitations related to fibromyalgia are difficult to impossible to quantify with objective measures." R. 1176–77.

EPIC sought the same information from Karen Wendler. R. 1179–80. Like Dr. Nuenninghoff, Wendler responded that Niemuth could only sit, stand, and walk each for a total of less than one hour during an eight-hour workday and was incapable of returning to full

time work either with or without restrictions. However, Wendler's report noted that the functional abilities she described were "determined based on patient's verbal report." R. 1180.

In July 2019, EPIC asked a third-party vendor, R3 Continuum, to conduct an independent medical review of Niemuth's claim. R3 assigned Niemuth's file to Dr. Sushil Sethi, who is board-certified in occupational medicine, general surgery and thoracic surgery. R. 1166. After reviewing Niemuth's records, including the report from Dr. McCoy and the records and statements from Dr. Nuenninghoff and Wendler, Dr. Sethi concluded that there was no primary physical diagnosis that would cause any limitations in function. He explained:

> Lori Niemuth has nonspecific generalized pains, but the medical records do not provide any specific inflammatory changes of any joints, ligaments, or muscles. There are no trigger points described. There is no range of motion of any of the joints, muscles, of [sic] body parts provided to show the presence of any impairment or medically necessary restrictions . . . She has had multiple treatments with rheumatologist Dirk Nuenninghoff, but he does not provide any formal rheumatology findings to show the presence of any fibromyalgia or any decrease in range of motion of any of the muscles, ligaments, or joints. I conclude that after a thorough review of the medical records today I do not find any medical documentation to show the presence of any inflammatory changes of any muscles or joints or any fibromyalgia trigger points. I find that the medical records do not support any functional impairment or medically necessary restrictions.

R. 1166.

In addendums to his report, Dr. Sethi noted that he had spoken with Wendler, who told him she believed Niemuth was incapable of working because of her symptoms, but Wendler had no objective measurements to provide because the symptoms were subjective. Wendler told Sethi that Niemuth's fibromyalgia was not in control as no medication had worked, and no change was expected. R. 1169. Sethi also spoke to Dr. Nuenninghoff, who

confirmed that he did not have any specific medical findings showing limitations of any extremities or joints. R. 1802.

### E. EPIC's termination decision

On August 8, 2019, EPIC advised Niemuth that it was terminating her LTD benefits because it had determined that she no longer met the policy's definition of disability as of August 6, 2019. R. 136–141. After setting out the policy provisions concerning "disability," "your occupation," "essential duty," and "termination of benefits," EPIC stated that it had denied Niemuth's claim based on "policy language." R. 138. After briefly summarizing the medical evidence, EPIC wrote, in relevant part:

> Clarification of your functionality was requested from Dr. Neunninghoff [sic] in 6/19/2019. He responded that limitations related to fibromyalgia are difficult to impossible to determine with objective findings.
>
> Your claim was referred for a clinical review by the Medical Case Manager (MCM) to clarify function. An independent Peer review was completed by Dr. Sethi on 7/23/2019. Dr. Sethi reviewed the medical information on file from your physicians. Based on the totality of the evidence provided in the medical records, Dr. Sethi opined that you are capable for working full time without restriction.
>
> Dr. Neunninghoff was provided with a copy of the Peer Report for review and comment. He did not agree with the findings; however, he did not provide any medical evidence to support his opinion. Dr. Sethi discussed your claim with Ms. Wendler, PA-C and noted that your symptoms were self perceived and she was unable to provide specific documentation to support any restrictions and limitations.
>
> We have concluded from the combination of all the medical information in your file that you are not impaired from work full time.
>
> We compared this information to the Essential Duties of Your Occupation as an Executive Assistant. Based on this information,

we have concluded that you are able to perform these duties as of 8/5/2019.

Following its termination decision, EPIC received a letter about August 26, 2019, from Dr. Nuenninghoff. The doctor stated that he had been following Niemuth since November 3, 2014, and that she "has and has had very debilitating fibromyalgia." R. 582. He then recited the policy's definition of "disability" and stated conclusorily that she met it. He also said that EPIC had "misconstrued and distorted" the information he had provided to it, but he did not further explain that statement. *Id*.

**F.  Niemuth's Social Security disability claim**

On October 17, 2019, Niemuth was awarded disability benefits by the Social Security Administration. Although state agency medical consultants had concluded that Niemuth could perform medium work with some limitations, an administrative law judge found after a hearing that these reports did not adequately consider "the medical evidence such as tender points confirming fibromyalgia, the opinions from [Dr. Nuenninghoff], and the evidence from her employer that her symptoms caused her to miss work and be unable to reliably sustain work tasks." R. 847. Relying in part on Dr. Nuenninghoff's opinion, the ALJ concluded that Niemuth could perform sedentary work with certain postural limitations, could perform bilateral handling and fingering only occasionally, and would be expected to miss work at least four full or partial days per month. R. 846. Relying on the testimony of a vocational expert, the ALJ found that plaintiff could not perform her past relevant work as an Executive Assistant. R. 847. He also found that, based on her age, she would be found disabled under the SSA's Medical-Vocational guidelines even if she had the functional capacity for the full range of sedentary work. R. 848. The agency noted that medical improvement was expected with

appropriate treatment and recommended that Niemuth's claim be reviewed in 24 months. R. 627.

## G. Niemuth's appeal to EPIC

Niemuth, by counsel, appealed EPIC's termination of her benefits in February 2020. Niemuth supplied additional evidence including a January 9, 2020, Residual Functional Capacity Questionnaire completed by Dr. Nuenninghoff and a copy of her complete social security disability claim file from the Social Security Administration. R. 2677-2696.

EPIC obtained a second independent medical review from Dr. Angelica Shepard on February 26, 2020. Dr. Shepard, who is board-certified in internal medicine and rheumatology, opined that Niemuth's condition was not associated with functional impairment warranting activity restrictions and limitations from a rheumatology standpoint. Dr. Shephard explained her rationale as follows:

> The claimant has a long history of fibromyalgia and has been describing widespread body pain along with chronic fatigue and trigger points related to her fibromyalgia. Her physical exam also reveals normal motor strength, sensation, DTR, negative long tract tension signs, no use of ambulatory aids, no non-functional ROM or significant postural abnormalities precluding her occupational functioning. The provider opines that the claimant has restrictions due to fibromyalgia and trigger points . . . However, the claimant has no evidence of systemic rheumatologic/inflammatory disorder. She has the established diagnosis with fibromyalgia. She describes self-reported pain symptoms and has trigger points. However, the approach to fibromyalgia requires exercises, more active life style rather than rest all day. The claimant has no musculoskeletal system or neurologic deficit. Self-reported myofascial pain without underlying neurologic, inflammatory or degenerative disease is not an indication for impairment. The approach to fibromyalgia is aimed at decreasing pain with medications, exercise, improving sleep, avoiding stress, treating appropriately the mental issues (if there is underlying psychiatric disorder), following dietary

> precautions, all of which can be accomplished concomitant with
> full time employment of the claimant's usual capacity.

R. 1796.

EPIC gave Dr. Nuenninghoff a chance to respond to Dr. Shepard's assessment. In a letter dated March 6, 2020, Dr. Nuenninghoff affirmed his previous limitations, stating that Niemuth was unable to sit, stand, or walk more than a total of 1 hour each within an eight-hour period related to "severe, widespread myofascial pain." R. 1779. Dr. Nuenninghoff stated he had reviewed Dr. Shepard's assessment and "strongly disagree that the patient's symptoms related to severe fibromyalgia are not associated with functional impairment." *Id*. However, the doctor did not attach any additional medical or examination findings to his letter.

Dr. Shepard prepared an addendum dated March 10, 2020. She stated:

> The previous determination remains unchanged; I re-acknowledge reported symptoms of widespread myofascial pain, reportedly severe, however, despite noted extensive pain symptoms, there is no clinical indication to limit sitting, standing, or walking as there is no evident loss of [range of motion], gait/mobility or motor function to preclude functionality.

R. 980.

The next day, EPIC sent a letter to Niemuth allowing her the opportunity to respond. On March 31, 2020, Niemuth responded through counsel and provided (1) a March 12, 2020 office visit note from Dr. Nuenninghoff on which he stated again that Niemuth had incapacitating symptoms from fibromyalgia; and (2) Niemuth's 2014, 2015, and 2016 annual performance reviews. Counsel argued in her response that Nuenninghoff's note showed that Niemuth could not perform the physical requirements of her occupation and that the performance reviews showed she could not attend work on a regular basis. EPIC forwarded these materials to Dr. Shepard, who prepared another addendum reaffirming her previous

14

conclusion. Dr. Shepard noted that Dr. Nuenninghoff had not examined Niemuth during the March 12 visit and had again based his opinion on her self-reported symptoms. Dr. Shepard added that she "should repeatedly emphasize that I opine the claimant's symptoms have a strong correlation with her psychiatric issues on which I defer making comment." R. 1724. Responding to the question whether Niemuth would be an unreliable employee due to her chronic symptoms, Dr. Shepard wrote: "The claimant has no serious degenerative disease, systemic connective tissue disorder/inflammatory condition, neurologic deficit (deficits of motor strength, sensation or reflexes), evident loss of ROM or gait/mobility issues that explains or justifies any occupational functioning restrictions/limitations from rheumatology standpoint." *Id*.

EPIC then gave Niemuth the opportunity to respond to Dr. Shepard's latest addendum, which she did on April 20, 2020.

On April 24, 2020, EPIC upheld the claim termination. R. 98-107. After summarizing the medical evidence and Niemuth's job duties, EPIC stated that it had concluded from all of the evidence in the file, including the independent medical reviews, that "the evidence does not support that [Niemuth] is prevented from performing the duties of her own occupation on a full time basis." R. 106. Responding to Niemuth's argument that Dr. Nuenninghoff's opinion supported her claim and that the reports from Dr. Sethi and Shepard were unreasonable, EPIC said:

> [W]e are not of the opinion that her complaints are of such severity to preclude her from working. In fact, as outlined by Dr. Shepard, while Ms. Niemuth has described widespread body pain along with fatigue and trigger points, her physical exam also reveals normal motor strength, sensation, DTR, negative long tract tension signs, no use of ambulatory aids, and no non-functional range of motion or significant postural abnormalities precluding her occupational functioning. Moreover, per review

> Dr. Shepard reports the approach to fibromyalgia requires exercises, more active life style rather than rest all day.

R. 106.

EPIC recognized that Niemuth had been awarded Social Security Disability benefits, but noted that the standards for awarding social security benefits differed from EPIC's policy requirements. In particular, it noted, it appeared that the SSA had considered Niemuth's age in finding her disabled, whereas age was irrelevant under the LTD policy. R. 107. In response to Niemuth's argument that EPIC had previously accepted liability for her claim based on Nuenninghoff's statements, EPIC stated that "benefit eligibility is based upon one's functionality as a whole, and not based upon a medical diagnosis." R. 106.

Having exhausted her administrative remedies, Niemuth then filed this action to recover benefits under the policy.

ANALYSIS

Niemuth sues to recover LTD benefits under the terms of her plan under 29 U.S.C. § 1132(a)(1)(B). It is her burden to prove her entitlement to benefits under the policy. *See Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 663 (7th Cir. 2005) (ERISA plaintiffs must prove that their insurance contract entitles them to benefits). Under the policy, Niemuth was required to provide "satisfactory, objective medical proof" that she was unable to perform one or more essential duties of her occupation because of sickness.

The parties agree that the plan gives EPIC discretionary authority to determine eligibility for LTD benefits and that, therefore, this court must review EPIC's decision to terminate Niemuth's benefits under the "arbitrary and capricious" standard. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d

16

758, 766 (7th Cir. 2010). Though not a euphemism for a rubber stamp, under this standard "the reviewing court must ensure only that a plan administrator's decision has rational support in the record." *Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 362 (7th Cir. 2017) (quoting *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 360 (7th Cir. 2011)). The court also considers whether the plan administrator communicated "specific reasons" for its determination to the claimant, whether the plan administrator afforded the claimant "an opportunity for full and fair review," and "whether there is an absence of reasoning to support the plan administrator's determination." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009) (quoting *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832–33 (7th Cir. 2009) (internal quotation marks and citation omitted)).

Niemuth contends that EPIC's decision to terminate her benefits was arbitrary and capricious. Her main argument (which Niemuth presents in three parts) is that EPIC "ignored" her evidence in favor of the opinions of Drs. Sethi and Shepard, whose opinions she says were conclusory and unsupported. Most of this opinion will address this main argument. Then the court will briefly address Niemuth's secondary arguments: that EPIC ignored the determination that Niemuth was entitled to social security benefits; failed to conduct a vocational analysis; and operated under a conflict of interest.

## A.  EPIC's consideration of the medical evidence

EPIC approved Niemuth's claim, but it was not stuck forever with that initial determination. "ERISA does not prohibit a plan administrator from performing a periodic review of a beneficiary's disability status." *Holmstrom*, 615 F.3d at 767; *see also Leger*, 557 F.3d at 832 (plan's payment of benefits does not "operate[] forever as an estoppel")(quoting *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002) (quotation marks

17

omitted)). "The plan administrator is entitled to seek and consider new information and, in appropriate cases, to change its mind." *Id*. Here, EPIC plainly "changed its mind" about Niemuth's claim after Dr. Nuenninghoff submitted an APS suggesting that Niemuth could return to work and then reversed course after Niemuth contacted him, which was around the same time that Dr. McCoy declined to submit an APS in support of Niemuth's disability claim. In light of these facts, it was reasonable for EPIC to seek more information before continuing to pay Niemuth's claim. In any case, "the previous payment of benefits is just one 'circumstance,' i.e., factor, to be considered in the court's review process; it does not create a presumptive burden for the plan to overcome." *Leger*, 557 F.3d at 832 (citation omitted).

The Seventh Circuit has recognized that fibromyalgia and other conditions diagnosed entirely on subjective symptoms "pose difficult problems for private disability insurance plan administrators and the Social Security Administration, who understandably seek to make decisions based on the most objective evidence available." *Holmstrom*, 615 F.3d at 769. Some people may have such a severe case of fibromyalgia such that they cannot work, but "most do not." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). The challenge for disability administrators in a case involving entirely subjective symptoms is to distinguish those who can work from those who can't.

The court of appeals has distinguished between purely subjective symptoms and objective evidence of pain-based functional limitations. In *Hawkins v. First Union Corporation Long–Term Disability Plan*, 326 F.3d 914 (7th Cir. 2003), the court held that the plan acted arbitrarily and capriciously in denying a claim for benefits because its primary medical consultant stated that sufferers of fibromyalgia could never be disabled because the pain experienced was entirely subjective and not capable of being confirmed by objective findings.

*Id*. at 918–19. However, in *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007), the court clarified that a plan administrator can require objective proof of the *degree* to which an individual's pain or fatigue limits his functional capabilities, because an individual's functional capacity "can be objectively measured." *Id*. at 322 (emphasis added). *See also Majeski*, 590 F.3d at 485 ("[A]lthough a plan may not deny benefits solely on the basis that the symptoms of the claimed disability are subjective . . . a plan may deny benefits because a claimant has failed properly to document pain-induced functional limitations.") (citations omitted).

Applying this distinction in *Williams*, the court found that Aetna had not acted improperly in denying Williams's application for LTD benefits based on chronic fatigue syndrome where there was nothing on a functional capacity questionnaire completed by his treating physician showing that Williams's functional capacity had been accurately tested. *Id*. at 323. As the court explained:

> Despite the fact that the questionnaire asked for responses, Dr. Sorin did not explain his conclusion that Williams was only capable of low stress jobs or measure Williams's ability to lift anything weighing ten pounds or more. Even more troubling is that the sections Dr. Sorin marked "unknown" and "untested" call into question the accuracy of other assessments that he did make. For example, if it was "unknown" how many minutes or hours Williams could stand at one time before needing to sit down, it is unclear how Dr. Sorin reached the conclusion that Williams could only stand or walk less than two hours total in an eight hour working day. Similarly, it is uncertain how Dr. Sorin determined Williams was significantly limited in doing repetitive reaching, handling, or fingering, when he wrote "untested" next to the boxes asking for the percentage of time in an eight hour work day Williams could perform each of these activities.

*Id*.

19

By contrast, the court found in *Holmstrom* that a functional capacity evaluation that repeated "20 different detailed tests" on consecutive days "provided exactly the kind of detailed and specific information that the *Williams* court found lacking" and provided objective support for functional limitations amounting to total disability. 615 F.3d at 770. *See also Griffin v. AT&T Umbrella Benefit Plan No 3*, No. 18-C-1804, 2020 WL 1185286, *6 (E.D. Wis. Mar. 12, 2020) (plan's denial of LTD claim for lack of objective evidence of functional limitations of plaintiff's chronic fatigue syndrome was not arbitrary and capricious, where "[n]either Griffin nor his doctor presented any objective test results showing, for example, Griffin's diminished ability to lift weights, climb stairs or ladders, or perform other job duties because of his CFS."); *Wilcox v. Aetna Life Ins. Co.*, No. 18-C-463, 2019 WL 4039127, *6 (E.D. Wis. Aug. 26, 2019) (claims administrator did not act unreasonably in denying LTD benefits where the record did not contain "results from specific tests that objectively demonstrate Wilcox's limitations due to the pain that he experiences as a result of his conditions."); *Kirsch v. Jefferson Pilot Fin. Ins. Co.*, 2008 WL 2468423, *7 (E.D. Wis. 2008) (upholding claim denial where plaintiff did not identify "any specific objective data reflecting the extent of her functional impairment").

Relying on these cases, EPIC argues that it properly terminated Niemuth's LTD benefits because she failed to meet the policy's requirement that she provide objective medical evidence of her disability. The court agrees. Apart from some one-time findings of limited cervical range of motion, mild enlargement of a salivary gland, and a slightly positive carpal tunnel compression test, the only objective medical evidence that Niemuth identifies to support limitations are the positive tender points noted by Dr. McCoy and Dr. Nuenninghoff during their examinations. These findings may be enough to support a fibromyalgia diagnosis, but they offer no support for her claimed inability to sit, stand, or walk for a total of only three

hours in an eight-hour period, much less for her asserted inability to lift more than five pounds or perform reaching, handling, and fingering activities more than occasionally. Indeed, both Dr. Nuenninghoff and Wendler *admitted* that they could not offer any objective support for the limitations endorsed on their functional assessments and that they were merely parroting Niemuth's subjective complaints. Where the claimant fails to produce any objective evidence that her subjective symptoms cause any functional limitations, a plan administrator does not act unreasonably in denying LTD benefits. *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 624 (7th Cir. 2008) (plan was "entitled to consider the subjective nature of Speciale's complaints when deciding if she was disabled, and those symptoms, standing alone, were not enough to rise to the level of total disability.").

Niemuth attempts to distinguish *Williams*, arguing that the problem in that case was simply that the doctor had not properly *completed* the functional capacity questionnaire. That problem is absent here, she argues, because Dr. Nuenninghoff completed the forms fully and accurately. Niemuth finds support for her position in *Weitzenkamp v. Unum Life Ins. Co.*, No. 09-C-1017, 2010 WL 4806979, at *5 (E.D. Wis. Nov. 19, 2010), *aff'd in part, rev'd in part on other grounds*, 661 F.3d 323 (7th Cir. 2011), where the court found that a properly-completed functional capacity form from the plaintiff's treating rheumatologist was likely as much "objective" evidence as could reasonably be expected for a patient with fibromyalgia, given that "any medical assessment of the disease's limitations will necessarily be based on the patient's subjective reports of pain."

But *Weitzenkamp* is difficult to reconcile with *Holmstrom*, where the court cited the doctor's failure in *Williams* to perform any "specific tests of physical ability or endurance" (not simply to complete the form) that justified discounting the doctor's opinion of the plaintiff's

21

limitations. *Holmstrom*, 615 F.3d at 760 (discussing *Williams* and stating the court reached its decision "because no specific tests of physical ability or endurance were ever performed"). *Weitzenkamp* also conflicts with *Speciale*, 538 F.3d at 624, where the court said that the plaintiff "never produced any objective evidence that her pain caused any functional limitation," even though the plaintiff's evidence included a functional-capacity questionnaire completed by her treating rheumatologist. *Id*. at 618.

The basic principle is that a treating rheumatologist's well-supported responses to a functional-capacity questionnaire *could* suffice as "objective" medical evidence of disability. But EPIC did not act unreasonably in finding that Dr. Nuenninghoff's questionnaire responses were inadequate here. EPIC specifically asked Dr. Nuenninghoff to state his "medical rationale" for the restrictions, but he offered none, stating only that limitations related to fibromyalgia were "difficult to impossible" to quantify with objective measures. If the doctor had provided some explanation confirming that the limitations were based on his own medical assessment of Niemuth rather than simply what she told him, Niemuth might have a stronger argument that EPIC unreasonably rejected his opinion, notwithstanding the absence of objective test results. Instead, all Dr. Nuenninhoff offered were conclusory statements that Niemuth's condition was "debilitating" or "incapacitating" and that she met the policy definition of disability.

EPIC had several good reasons to question the reliability of Dr. Nuenninghoff's opinions. First, he did not explain why he changed his January 17, 2019 Attending Physician Statement after Niemuth contacted him other than to say that it had been completed "incorrectly." Second, he often opined about Niemuth's limitations without having recently examined her and he made some statements about her limitations that were directly

contradicted by Niemuth's own statements (including, for example, that she could lift only five pounds when she told EPIC she could lift 40 pounds, and that could sit for less than an hour at a time, when she reported being able to sit in a car for 1.5 hours). Third, Dr. McCoy, the other rheumatologist, declined to provide an Attending Physician Statement. Niemuth proffers her own reasonable, neutral explanations for these facts, but it was equally reasonable for EPIC to question whether Dr. Nuenninghoff was functioning "more as an advocate than a doctor rendering objective opinions." *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 578 (7th Cir. 2006).

Even so, EPIC did not simply "ignore" Dr. Nuenninghoff's conclusions, as Niemuth contends. To the contrary, EPIC asked both him and Wendler to supply their medical rationale and any supporting clinical findings for their assessment of Niemuth's restrictions. When that clarification failed to materialize, EPIC had Niemuth's claim reviewed independently by other physicians. A plan's decision to "seek independent expert advice is evidence of a thorough investigation." *Id.* at 575. Both independent experts confirmed what EPIC's medical case manager observed: there were no objective clinical findings or testing to support the functional restrictions endorsed by Niemuth's treating providers, or indeed, any medical basis to find any functional restrictions at all.

Niemuth devotes much of her briefing to criticizing Dr. Sethi's and Dr. Shepard's reports, arguing that they were so inherently flawed that it was arbitrary and capricious for EPIC to rely on them. Dkt. 22, at 17-28. *See Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 813 (7th Cir. 2006) (court may not second-guess plan's reliance on consulting physicians in absence of bias or "inherent flaw[s]"). Given Niemuth's failure to produce objective medical evidence in support of her claimed limitations, her criticisms of the doctors' opinions are largely

beside the point. But EPIC appears to have relied at least in part on these opinions in terminating benefits, so the court will address Niemuth's arguments briefly.

Niemuth's main criticism is that the reviewing doctors' focus on the absence of positive clinical data such as laboratory testing, range of motion, inflammatory changes, swelling and other joint deformities, neurological deficits, motor strength and deep tendon reflexes was "entirely misplaced" because the main symptoms of fibromyalgia, pain and fatigue, are entirely subjective and "won't appear on laboratory tests." Dkt. 22, at 26 (quoting *Kennedy v. Lilly Extended Disability Plan*, 856 F.3d 1136, 1139 (7th Cir. 2017)). But this argument ignores the *Hawkins/Williams* distinction, discussed above, between the amount of pain or fatigue an individual experiences and the functional limitations resulting from that pain or fatigue, which can be objectively measured. Here, the reviewing physicians did not dispute that Niemuth experienced pain and fatigue, but they found a lack of objective evidence supporting her claim that her symptoms resulted in severe functional limitations rendering her disabled. This was not improper. *Speciale*, 538 F.3d at 622. And once again, Niemuth does not identify any objective evidence of functional limitations that the doctors overlooked.

Niemuth also argues that Dr. Shepard improperly implied that fibromyalgia could never be disabling when she noted that the approach to fibromyalgia "requires exercises, more active life style than rest all day." Niemuth's argument might be persuasive if this was all Dr. Shephard said in her report. Viewed in context, however, Dr. Shepard was merely offering an additional reason why she did not agree with the extreme limitations endorsed by Dr. Nuenninghoff, which would have meant Niemuth was bed-bound most of the day. As a rheumatologist, Dr. Shepard was qualified to remark on the standard of care for treating fibromyalgia and those observations were relevant to the reliability of Dr. Nuenninghoff's opinion and to Niemuth's

ability to work. *Accord Sieg v. Hartford Life & Accident Ins. Co.*, No. 20-C-1420, 2022 WL 1004199, at *7 (E.D. Wis. Apr. 4, 2022) (finding similar remarks by reviewing physician proper in context of noting that testing and exam findings did not support conclusion that plaintiff was incapable of any work). EPIC did not abuse its discretion when it relied in part on Dr. Shepard's report in affirming its conclusion that Niemuth was not disabled as of August 6, 2019.

Niemuth also argues that this court should reject EPIC's lack-of-objective-evidence defense because it never told her that it was terminating her LTD benefits for that reason. But Niemuth did not develop this argument until her reply, so she has forfeited it. *See, e.g., Mendez v. Perla Dental*, 646 F.3d 420, 423-24 (7th Cir. 2011) (arguments raised for the first time in reply brief are forfeited).

Even had she properly raised the argument, it is not persuasive. A plan administrator must give a specific reason for the denial, but "he does not have to explain to [the beneficiary] why it is a *good* reason." *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996) (emphasis in original). Here, EPIC's reason for the denial has always been that Niemuth failed to show that she could not perform the essential duties of her occupation as of August 5, 2019. The policy language plainly notified Niemuth that her benefits could be terminated if she failed to provide "objective medical proof" of continued disability, and EPIC recited this provision in its termination letter. In addition, before EPIC referred Niemuth's claim for an independent review, a claims representative told Niemuth that any functional limitations endorsed by Dr. Nuenninghoff had to be supported by medical evidence, and it actively solicited such evidence from him and Wendler. In its termination letter, EPIC specifically noted that neither Dr. Nuenninghoff nor Wendler was able to provide "specific documentation to support any

restrictions and limitations," and it referred to Dr. Sethi's review, which highlighted the lack of objective evidence to support the opinions of Niemuth's treating providers. These communications from EPIC were sufficient to allow Niemuth to formulate a further challenge to the denial, which is all ERISA's regulations require. *Gallo*, 102 F.3d at 923 (citing *Halpin*, 962 F.2d at 689).

In a similar vein, Niemuth argues that it is arbitrary and capricious for EPIC to now suggest that she should have undergone functional testing to support her limitations when it never articulated this requirement during the course of her LTD claim or appeal. But EPIC does not contend that Niemuth was *required* to undergo a functional capacities evaluation; what it says is that she needed to produce objective evidence of her functional limitations. I understand EPIC to be arguing that a functional capacities evaluation would be one way, but not the only way, that Niemuth might have met her burden. So far as it appears, Niemuth could also have met her burden if Dr. Nuenninghoff (or another provider) had provided some type of clinical testing or other objective measures of Niemuth's functional capacities, but he provided none.

Contrary to Niemuth's suggestion, this is not a case like *Holmstrom*, 615 F. 3d at 774, where the court found the plan administrator had acted unreasonably in advising the claimant that she could substantiate her claim of cognitive impairments with a "battery" to "assess her neurocognitive status," but then rejected the claimant's neurocognitive test results because the test conditions did not meet specified criteria that the plan had never communicated to the plaintiff. Here, the plan communicated to Niemuth that it could not accept Dr. Nuenninghoff's or Wendler's restrictive limitations unless they were supported by objective medical findings that supported functional limitations, and it gave Dr. Nuenninghoff multiple opportunities to

support his conclusions with such evidence. Each time, Dr. Nuenninghoff made clear that his opinion was based on Niemuth's subjective complaints and that he did not perform any clinical testing or measurements in arriving at his conclusions. Although the plan *could* have asked Niemuth to submit to an independent medical or functional capacities examination, Niemuth cites no authority requiring it to do so. *Cf. Williams*, 509 F.3d at 325 (request for independent medical examination or functional capacity evaluation is "merely one option at [the plan's] disposal."); *Davis*, 444 F.3d at 577 ("It is reasonable, therefore, for an administrator to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations."); *Griffin*, 2020 WL 1185286, at *8 ("The lack of evidence favoring Griffin did not mean that the Plan needed to supply such evidence itself or consult additional doctors until it found one that agreed with Griffin."). *See also Hagopian v. Johnson Fin. Grp., Inc. Long-Term Disability Plan, an ERISA Plan*, No. 09-C-926, 2010 WL 3808666, at *10 (E.D. Wis. Sept. 23, 2010) (regulation requiring plan to describe information necessary to "perfect the claim" does not mean plan needs to inform plaintiff how to "win the appeal.").

In sum, the court is satisfied from this record that EPIC communicated to Niemuth her obligation to provide objective medical evidence supporting her purported work-related limitations, complied with its duty to provide a full and fair review of Niemuth's evidence, and reasonably explained why that evidence was not sufficient to establish continuing disability. EPIC's decision is rationally supported by the record evidence and was not arbitrary and capricious.

## B.  Niemuth's social security disability benefits

Niemuth asserts that EPIC did not reasonably consider her social security disability award when it evaluated her LTD claim. The Seventh Circuit has repeatedly held that, while

"instructive," the SSA's determination of disability is not binding on a plan administrator. *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 398 (7th Cir. 2009); *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 610 (7th Cir. 2007). But a plan's failure to consider the SSA's determination in making its own benefit decisions can suggest arbitrary decision making and justify the court in giving more weight to a structural conflict of interest. *Holmstrom*, 615 F.3d at 772–73 (citing *Glenn*, 554 U.S. at 118). This concern is heightened where, as here, the plan requires the claimant to apply for Social Security benefits. *Id.*

In its letter denying Niemuth's appeal, EPIC acknowledged the SSA decision. It noted that disability was defined differently for social security purposes than under the policy, and pointed out that it "appear[ed]" that SSA had taken Niemuth's age into account in finding her disabled. But as Niemuth points out, her age was not critical to the SSA's disability finding. The ALJ found at step four of the SSA's sequential evaluation process that Niemuth was incapable of performing her past relevant work as an Executive Assistant, a finding that did *not* depend on her age and was not materially different from EPIC's requirement that she be unable to perform one or more of the essential duties of her occupation. *Accord Lacko v. United of Omaha Life Ins. Co.*, 926 F.3d 432, 443 (7th Cir. 2019). Thus, the reasoning offered by EPIC in its affirmance letter does not really hold up.

Nevertheless, on appeal EPIC offers additional, more compelling, reasons for distinguishing the SSA award. *Gallo*, 102 F.3d at 923 (plan administrator is not limited in court to repeating what he told the applicant). In particular, EPIC notes that the SSA did not have access to the same materials as EPIC, including the reports from Dr. Sethi and Dr. Shepard. Given the additional evidence possessed by EPIC that conflicted with Dr. Nuenninghoff's opinions and which gave EPIC a reasoned basis to depart from it, EPIC reasonably concluded

that the SSA determination was not entitled to much weight. *Cf. Lacko*, 926 F.3d at 443 (noting that plan "never challenged or questioned" the findings of doctor who performed mental functional capacity evaluation of plaintiff as part of the social security review and concluded she lacked mental capacity for skilled work).

## C.  Lack of vocational analysis

Niemuth argues that EPIC failed to "analyze her ability to perform her occupation in accordance with the Plan's definition of disability." Dkt. 22, at 36-40. For the most part, this is just a rehash of her argument that EPIC should have adopted the limitations found by Dr. Nuenninghoff and Wendler. Niemuth also points to a letter from her former employer indicating that beginning in May 2015 and continuing until she left her job in 2018, Niemuth had difficulty maintaining a regular schedule at work due to her "pain management challenges." But the plan required Niemuth to provide evidence of continuing disability in the form of objective medical evidence. Her past history of poor attendance reportedly based on subjective pain complaints is not medical evidence of continuing disability.

## D.  EPIC's conflict of interest

Finally, in deciding whether a plan's decision to deny benefits is arbitrary and capricious, courts must consider any conflict of interest that exists when a plan has the dual role of deciding and paying benefits claims. *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009); *Metro. Life Ins. v. Glenn*, 554 U.S. 105, 112 (2008). Generally, a conflict of interest is weighed as a factor in a court's review of an ERISA benefits decision and can act as a tie breaker in a close case. *Lacko*, 926 F.3d at 440. Conflicts "carry less weight when the insurer took active steps to reduce potential bias and to promote accuracy." *Raybourne v. Cigna Life Ins. Co. of New York*, 700 F.3d 1076, 1082 (7th Cir. 2012).

Specifically, a court should consider "the reasonableness of the procedures by which the plan administrator decided the claim [and] any safeguards the plan administrator has erected to minimize the conflict of interest." *Majeski*, 590 F.3d at 482.

This case needs no tiebreaker. But the conflict of interest is not significant here. EPIC took appropriate precautions to eliminate its conflict of interest by contracting with third party agencies who in turn referred Niemuth's case to independent physicians. *Dragus v. Reliance Standard Life Ins. Co.*, 882 F.3d 667, 673 (7th Cir. 2018). EPIC also provided Niemuth with the opportunity to appeal, gave her copies of the doctor's reports, and allowed her and Dr. Nuenninghoff to respond. *Id*. Niemuth has not otherwise pointed to any circumstance indicating that EPIC's conflict of interest tainted its decision.

## E.  Conclusion

In sum, EPIC gave a satisfactory explanation, based on a reasonable interpretation of evidence in the record, for denying Niemuth's claim. The justifications given by EPIC, while not indisputable, are reasonable, "which is all that is required." *Speciale*, 538 F.3d at 624. Because the record contains rational support for EPIC's assessment, this court will not disturb its decision to terminate Niemuth's claim for disability benefits.

ORDER

IT IS ORDERED that:

1. Lori Niemuth's motion for summary judgment, Dkt. 20, is DENIED.

2. Defendant The EPIC Life Insurance Company's motion for summary judgment, Dkt. 23, is GRANTED.

3. The clerk of court is directed to enter judgment and close the case.

Entered December 1, 2022.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge